**Mary ROLLIN et vir, Appellants,**

**v.**

**CONDRA FUNERAL HOME, Appellee.**

No. 10534.

Court of Civil Appeals of Texas.

Austin.

Jan. 22, 1958.

Rehearing Denied Feb. 12, 1958.

Ralph W. Yarborough, Richard W. Yarborough, Tom H. Davis, Austin, for appellants.

Hart, Brown, Sparks & Erwin, Austin, for appellee.

HUGHES, Justice.

This is a suit for damages for personal injuries brought by appellants Mary Rollin and husband John Rollin individually and as the heirs at law of their deceased daughter, Ida Nell Rollin, against appellee, Condra Funeral Home, a name assumed by Ray Condra of Williamson County and under which he does business.

Trial to a jury resulted in verdict and judgment for appellee.

The injuries sustained by Mrs. Rollin occurred when an ambulance owned by appellee and operated by his employee, Charles A. Sartor, collided with an automobile driven by Lee Andrew Shivers at the intersection of 34th and Guadalupe Streets in Austin, Travis County, about 7:30 A.M. on December 2, 1955.

Mr. and Mrs. Rollin were passengers in the ambulance. They were accompanying their critically ill young daughter from Round Rock, in Williamson County, to Austin. They did not see any of the events, conditions or circumstances which explain or have a bearing upon the manner in which the collision occurred.

The scene of the collision is depicted below:

Plaintiff's Exhibit No. 4

This photograph was made on Guadalupe Street with the camera pointed east of south toward the intersection of such street and 34th Street, the camera being about 200 feet north of such intersection and its lens being about the height of a person seated in an automobile.

According to appellee's witness, Theodore W. Holmes, the collision occurred in the manner and under the circumstances disclosed in the following statement made by him and introduced in evidence by appellee:

"On December 2, 1955 at about 7:30 A.M. I was a passenger in a 1940 Dodge 2 door owned and driven by Lee Andrews Shivers who lives at 1600 Washington Ave. Austin, Texas. I ride to work every morning with Shivers since we both work at the same place. On the morning of December 2, 1955 at about 7:30 A.M. I was riding in the car with Shivers and he was doing the driving. In the front seat with Shivers was his wife. Neither Shivers or his wife can hear both are deaf. While I am riding with Shivers I watch the traffic lights and also so does his wife. Shivers was driving along west on 34th street and when he was approaching 34th and Guadalupe st. he had slowed down for a red light. I would say that he had slowed down to about 25 mph. I was watching the traffic light and when Shivers was about three car lengths from the intersection and had just topped the steep hill going west on 34th street I saw the light change to green. When the light changed to green Shivers started on to cross Guadalupe street. Just as the traffic light changed to green I heard a siren to the north. Shivers being deaf could not hear and I did not know how far the siren was away and did not have time to warn him and just as we were where I could see to the north I saw this ambulance coming south on Guadalupe street. This ambulance was right at the intersection with its siren on and also its red lights. Shivers had all ready driven out into the intersection and he glanced and saw the ambulance with its lights on and he cut to his left trying to avoid an accident and about this time the ambulance hit Shivers car at the right door knocking Shivers car over to the south and Shivers car then hit a car which was stopped headed east on 34th street. The left front of Shivers car hit the left front of this east bound car. At the time of this accident the traffic light was green for westbound traffic." [1]

Guadalupe Street is 60 feet wide. 34th Street is 30 feet wide. The point of impact between the ambulance and the Shivers' car was at a point 15 feet east of the west curb line of Guadalupe Street and 8 feet south of the north curb of 34th Street. Stated differently, the Shivers' car had penetrated the intersection 45 feet and was three fourths of the way across Guadalupe Street and the ambulance had penetrated the intersection eight feet and was a little over one fourth (26.6%) of the way across 34th Street.

The Shivers' car left no skid marks. The ambulance left 18 feet of skid marks, which, according to Police Officer, A. R. Schulle, a witness for appellants, would indicate a speed of 15 to 22 miles an hour when the brakes were applied without considering the additional speed of the ambulance at the time and point of impact, which in the opinion of Mr. Schulle was "very slow".

The ambulance upon striking the Shivers' car was carried four feet west where

1. Art. 6701d, Sec. 24(b), Traffic Regulations Act, Vernon's Ann.Civ.St., provides:
   "The driver of any authorized emergency vehicle when responding to an emergency call upon approaching a red or stop signal or any stop signs shall slow down as necessary for safety but may proceed cautiously past such red or stop sign or signal. At other times drivers of authorized emergency vehicles shall stop in obedience to a stop sign or signal."

it came to rest. The Shivers' car veering slightly to its left continued until it struck the Wells' car which was stopped on 34th Street near the west edge of Guadalupe Street.

The driver of the ambulance, Mr. Sartor, stated immediately after the collision, according to Officer Schulle, that as he approached the intersection where the collision occurred he was driving "35 to 40."[2]

Mr. Sartor testified by deposition only from which we quote:

"Q. What was the condition at the intersection as you approached it as regards traffic? Do you—A. There was a lot of traffic there, sir.

"Q. And what color was the light in your direction when you started off? A. I don't know, sir.

"Q. You don't know. Do you recall what color it was when you came up to the intersection? A. No, sir.

"Q. Then, you didn't notice the light at all? A. No, sir.

"Q. Did the ambulance skid? A. No, sir.

"Q. It didn't? A. No, sir.

"Q. Referring now just to your right half, were you toward the center line, or were you toward the curb, or were you more or less in the middle? A. I was in the middle.

"Q. You were just about in the middle of your right half? A. Yes, sir.

"   *   *   *   *   *

"Q. Mr. Sartor, do you recall whether or not you told the Police Officer who was investigating the accident that coming up to the intersection there, as you were approaching the intersection, that you were driving between 35 and 40 miles an hour? A. No, sir.

"Q. Do you now say that you did not tell him that? A. No, sir.

"Q. You don't say that you didn't tell him that? A. No, sir.

"Q. Then, is it your position, then that you could have told him that, but that you do not remember it? * * * A. Yes, sir.

"Q. Then, you could have told him that you were driving 35 or 40? A. Yes, sir.

"   *   *   *   *   *   *

"Q. All right, sir. Do you recall just where the cars were, which way they were headed? A. Yes, sir. I pulled up to the light and stopped, taken a glance over to my left, and not seeing any traffic, I glanced back to my right, and there was a pick-up there that was fixing to pull out and did pull out and came around me there at the intersection.

"Q. Uh huh. A. And then there was a man in a blue Ford kept easing up, and up, and I thought he was coming.

"Q. Uh huh. A. And just about the time this pick-up went around the front of our ambulance, then I could tell that he was stopped.

"Mr. Brown: You mean the man in the blue Ford? A. Yes, sir, the man in the blue Ford was stopped, and so I had the ambulance in low. I had the siren blowing, and I gave it a pretty good feed to start off.

2. Sec. 33.33 of the Code of the City of Austin provides:
"that the maximum reasonable and safe speed for the operation of vehicles upon the streets of the city is thirty miles per hour and no person shall drive a vehicle on any street in the city at a speed greater than thirty miles per hour; * * *"
   Ambulances on emergency calls are not shown to be exempt from the ordinance.

"Q. Uh huh. A. And just as I pulled off, I got a glimpse of this negro just as he swerved.

"Q. And he was coming in from your left? A. Yes, sir.

"*    *    *    *    *    *

"Q. Now, just about how far back from the actual intersection did you stop? A. I will say two cars length.

"Q. Two car lengths? A. Yes, sir.

"Q. And about how long were you stopped before you started again? A. Just a matter of seconds.

"Q. Two or three or four? A. I would say three seconds.

"Q. Three seconds. All right, sir. When you saw this car coming from your left, what did you do at that time? A. I applied my brakes.

"Q. You applied your brakes? A. Yes, sir.

"Q. Did the ambulance skid? A. No. sir."

Mr. Wallace Wells who testified for appellants was an eye witness to the collision. He testified that when he first saw the ambulance it was about 135 or 140 feet from the Guadalupe-34th Streets intersection and was traveling about 35 miles per hour.

Appellee's witness Mr. Holmes, who was a passenger in the Shivers' car testified:

"Q. Now did you observe the ambulance sufficiently to form any opinion as to how fast the ambulance was going? A. Definitely, no, sir.

"Q. You did not see it long enough to form any opinion? A. No, sir.

"*    *    *    *    *    *

"Q. All right, sir, thank you. Now Mr. Holmes, about the speed of this ambulance, you have testified that you saw it long enough to see that the red lights were flashing and all and it was up at the north line of Mr. Weedon's filling station. Now I want to ask you whether or not that ambulance was going faster or slower than Mr. Shivers' car? A. Well, I could not definitely say.

"Q. I know you can't probably definitely say, but do you have any opinion? A. I have no opinion.

"Q. Isn't it a fact, Mr. Holmes, that you have previously told me that that ambulance was going much faster than Mr. Shivers' car? A. Previously I made no such statement to that effect.

"Q. I didn't say a written statement now, Mr. Holmes. A. I may have told you but it was not in any statement of any such.

"Q. It was not in a written statement but you may have told me that the ambulance was going much faster than Mr. Shivers' car; did you tell me that or not? A. I said in all possibility it had to be.

"Q. I see. And so far as you are concerned, it was going faster than Mr. Shivers' car? A. As far as I am concerned, no.

"Q. And haven't you told other people, soon after this accident happened, back in December of 1955 and just recently, that the ambulance was going a lot faster than Mr. Shivers' car? A. I don't recall."

Mr. William McConnell, Principal of the Texas Blind, Deaf and Orphans' School, testifying for appellants stated that the witness Holmes told him "that when he heard he siren and looked down a little ways and saw the ambulance before he could tell Mr. Shivers what to do the ambulance was there and he doesn't know how fast it was going but it had to be going a lot faster than 30 miles an hour."

As also bearing on the issue of speed we quote from appellee's brief the substance

of certain testimony given by Mr. and Mrs. Rollin:

(Mr. Rollin) "said that two or three seconds before the collision occurred the ambulance was stopped sufficiently to throw him forward in the ambulance. After stopping the ambulance started up again and the witness was then 'throwed the other way.' Later the witness testified that the ambulance did not stop but that 'he hit the brakes, but I can't say that he come to a dead still stop, because I was looking backwards and paying no attention to him.' In another part of his deposition he testified that the ambulance was slowed down suddenly three or four seconds before the accident and then was started up again. Mrs. Rollin, who was also riding in the ambulance, said that she could not say that the ambulance stopped before the collision, but that she could feel the motions of being thrown forward and then backward, as if the ambulance slowed down suddenly and started up again and finally gave her version as follows:

"'Q. Well, after that first stop, could you give me any idea about how fast he got up to before the accident?

"'A. Well, I have to say, like my husband, I don't think he really stopped. I thing he checked, but I don't think he ever stopped. I don't think he had time.'"

There is sharply conflicting evidence as to the relative position of the cars as they approached the intersection. Mr. Wells testified that when the rear of Shivers' car was at the east line of Guadalupe Street the front of the ambulance was 20 feet north of the north line of 34th Street. Allowing for the length of the Shivers' car this would place the two vehicles at approximately the same distance from the point of impact.

Mr. Holmes testified that when the Shivers' car entered the intersection the ambulance was at a point shown to be about 95 feet from the point of impact.

These conflicting versions have a bearing both on the speed of the vehicles and the keeping of a proper lookout.

The jury made these findings:

A. The driver of the ambulance: (1) did not fail to keep a proper lookout; (2) was not "at the time of and immediately before the collision" operating the ambulance in excess of 30 miles per hour; (3) did not fail to slow down as necessary for safety in approaching the street intersection; (4) did not fail to proceed with caution past the red signal light at the street intersection.

B. The failure of the Shivers' car to yield the right of way to the ambulance was not the sole proximate cause of the collision.

C. The collision was the result of an unavoidable accident.

Along with its verdict the jury returned into Court the following communication:

"We, the jury, would like to recommend to the court, due to the testimonies of Dr. Griffin and Dr. Lowrey, on their estimated disability of Mrs. Rollin, that even though the driver of the ambulance is not found negligent, that Mrs. Rollin should be compensated in the sum of approximately $4000.00."

Appellants' first two points are based on the following:

■    During appellee's cross examination of appellants' witness Police Officer Schulle these proceedings occurred in the presence and hearing of the jury:

"Q. And I believe you gave him [driver of the Shivers' car] a ticket for failing to yield the right of way to the ambulance?

"Mr. Davis: Your Honor, I would like to object to that and ask that the jury be instructed that they should not consider any opinion he may have had

as to the fault; that they are the sole judges of fault in this accident, and anything of that character is improper and I think Mr. Brown knows it.

"The Court: Ladies and gentlemen of the jury, you will not consider the question and answer as to whether or not the driver of the Dodge was given a ticket, for any purpose in this case.

"Mr. Brown: Did I understand the Court instructed the jury not to consider the fact that he gave a ticket for failing to yield the right of way?

"The Court: I instructed them not to consider the question or the answer as to the ticket for any purpose in this case."

It is not denied and could not be successfully denied that the testimony sought to be elicited from the witness was inadmissible. Mooneyhan v. Benedict, Tex.Civ. App., Austin, 284 S.W.2d 741, writ ref. N.R.E.; Sherwood v. Murray, Tex.Civ. App., El Paso, 233 S.W.2d 879, 882. In the latter case the Court said:

"Evidence that Hoffman had forfeited a bond he had put up at the police station was inadmissible for any purpose. It may be assumed that the question propounded to Hoffman implied that he had been charged in the police court with failure to stop at the stop sign before entering the intersection of Blacker and Stanton Streets, had given bond on such charge and had forfeited such bond. Certainly it was highly improper for counsel to state in the presence of the jury that Hoffman did forfeit such bond. This was unsworn testimony by appellee's counsel. By the great weight of authority even evidence of a conviction in a criminal prosecution for the very acts which constitute the negligence sought to be established in a civil suit as the basis of liability is not admissible unless such conviction is based on a plea of guilty."

■ Appellee asserts, however, that this error has been waived by appellants' failure to move for a mistrial upon the objection being sustained by the Court and the jury being instructed to disregard the "question and answer", citing Ford v. Carpenter, 147 Tex. 447, 216 S.W.2d 558.[3]

This case holds that where defendant's counsel injects into the case the fact that plaintiff carried accident insurance the error is waived unless plaintiff timely makes a motion for mistrial. The Court in support of this holding cited only cases involving the improper injection of insurance into the case.

The cases which follow Ford v. Carpenter on this point are all "insurance" cases except Western Cottonoil Company v. Brecheen, 274 S.W.2d 767, and Western Cottonoil Company v. Patterson, 271 S.W.2d 106, writ ref., N.R.E., both by the Eastland Court of Civil Appeals and Phoenix Indemnity Company v. Skinner, 271 S.W.2d 294, writ ref., N.R.E., by the Dallas Court of Civil Appeals.

In Brecheen appellees' counsel informed the jury that an injunction had been issued against appellant in a similar case. The Court assumed this was reversible error but held it was waived for failure of appellant to move for a mistrial.

The Patterson case is similar in nature and ruling.

We have examined the application for writ of error in the Patterson case and find that error was assigned to the ruling of the Court of Civil Appeals that it was not reversible error for respondent to testify that an injunction had been previously granted

---

3. Our decision in Dimmitt v. Dimmitt, 263 S.W.2d 648, writ dismissed, is also cited. There we held that a motion for mistrial based on asking a witness an improper question was too late when not made until after the jury had returned its verdict.

against petitioner because of the odors for which damages were being sought. Whether the Supreme Court refused the application N.R.E. under its Rule 503 (similar to our Rule 434) or under the mistrial rule of the Ford case we do not know. We prefer to believe that the Court did not approve that portion of the opinion of the Court of Civil Appeals holding that the erroneous admission of such evidence was waived by not moving for a mistrial.

In Phoenix the mistrial motion requirement was applied to jury argument. In that case, however, the Court was doubtful that the argument, which was not objected to, was harmful.

In McDonald's Texas Civil Practice, Sec. 18.02, it is stated that "During the trial an error or irregularity may occur which is so malefic that its prejudicial tendency can be removed only by declaring a mistrial."

As we understand the law the improper mention of "insurance" upon the trial of a case is an error of the nature mentioned by Mr. McDonald and the offended party is entitled to a mistrial upon request but if not requested the error is waived.

Until or unless other trial errors are or have been held by the Supreme Court to be errors of such magnitude we believe it our duty to appraise properly preserved and assigned errors under the formula prescribed in Rule 434, Texas Rules of Civil Procedure, unaided by the escape rule promulgated in Ford. If this decision were extended to all trial errors then Rule 434 would be a "dead letter" for there would either be no error (reversible) or there would be no trial.

Appellee relies, principally, upon the following cases to sustain its argument that the error here was harmless: Goforth v. Alvey, 153 Tex. 449, 271 S.W.2d 404; Colls v. Price's Creameries, 244 S.W.2d 900, writ ref., N.R.E., El Paso Court of Civil Appeals, and Montgomery v. Vinzant, 297 S.

W.2d 350, Fort Worth Court of Civil Appeals, no writ history.

Goforth was a case in which a small child was struck by a car. The driver of the car made an unresponsive statement to the effect that investigating police officers had not given him a "ticket." No objection of any kind was made to this testimony and the Court of Civil Appeals held the error, if any, was waived. The question does not seem to have been presented in the Supreme Court.

Our case differs from Goforth in that objection was made by appellants and there is, we believe, a valid distinction between the failure of an officer to give a ticket where only one motorist is involved and giving a ticket to one of two motorists involved in a collision when a court is weighing the prejudicial effect of such evidence.

Colls is not factually in point. There was no evidence there that a traffic ticket was given by a police officer to a party involved in the incident, only that a police officer witness was asked if a little girl had asked him not to arrest the driver of a vehicle which struck another child because it was not his fault. A negative answer was made. Similar evidence was offered in other manner but not admitted.

We will not offend the dignity of traffic officers, skilled and experienced in fixing criminal responsibility in automobile collisions, by comparing their opinions with that of a small child.

In Vinzant the Court held that evidence that a criminal charge had been filed against a party to an automobile collision case and later dismissed was not reversible error especially since the Court was of the opinion that the statement signed by the party which contained the objectionable matter was independently admissible. The situation in Vinzant is not analogous to the one presented here.

The form of the question and counsel's remark leave no room to doubt that the jury was informed as a fact that Shivers was given a ticket for failing to yield the right of way and there was no evidence that such ticket had been dismissed.

Appellee argues that since there was no evidence that the officer did or did not give the ambulance driver a ticket there can be no inference that he did not receive a ticket because "everyone knows, as a matter of information and observation, that frequently (and possibly more often than not) the police will give traffic tickets to the drivers of both cars involved in a collision."

There are several answers to this argument first and foremost of which is that this Court will not countenance a holding that, as a matter of common knowledge, police officers give traffic tickets to anyone not thought by the officer to be violating the law.

As to the lack of proof that no ticket was given the driver of the ambulance we need only say that this could only have been proved by inadmissible testimony which neither party was required to offer or should have offered in evidence.

We also seriously doubt that a juror would be inclined to believe that counsel for appellee would bring up the matter of traffic tickets if his client had received one too. After all it was the negligence of the driver of the ambulance and not the negligence of the driver of the Shivers' car which was the paramount issue in this case.

If the ticket here had been for speeding, running a stop sign, failure to signal or some such collateral offense the error would be much more innocuous but here the ticket, reflecting the officer's opinion, was for failing to yield the right of way. This conclu-

sion or opinion of the officer carried double connotations, one that the ambulance had the absolute right to be where it was and the other that the Shivers' car had no right to be where it was at the time of the collision. As to the ambulance its right of way was qualified by the provisions of Art. 6701d, Sec. 24(b) supra, compliance with which the jury, not the officer, must determine.

We believe that the jury could fairly infer from the fact that the driver of the Shivers' car was given a ticket for failure to yield the right of way that Officer Schulle was of the opinion that the driver of the ambulance had proceeded against the red light in keeping with the requirements of the statute cited above.

It is our opinion from a consideration of the entire record, the material portions of which we have set out in this opinion, that the error discussed amounted to a denial of the rights of appellants as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case and that the instruction of the Court below did not cure the error.

Since, in our opinion the error discussed above requires a reversal we do not pass upon the assignment that the verdict of the jury is so against the weight of the evidence as to be clearly wrong. We will say, however, that if the ambulance in approaching the street intersection slowed down "as necessary for safety" and was proceeding "cautiously" past the red signal light when it skidded 18 feet (8 feet into the intersection) and crashed into the Shivers' car which was 45 feet into the intersection, then it was a most remarkable performance.

The judgment of the Trial Court is reversed and this cause is remanded.