J. R. HOBBS et al., Appellants,

v.

Reuben GRANT, Appellee.

No. 10576.

Court of Civil Appeals of Texas.

Austin.

May 28, 1958.

Rehearing Denied June 11, 1958.

352

Robertson, Jackson, Payne, Lancaster & Walker, W. B. Patterson, Louis P. Bickel, Dallas, for appellants.

Johnston & Johnston, Palestine, Glenn Faver, Jasper, Looney, Clark, Moorhead & Mathews, Mary Joe Carroll, Austin, for appellee.

Will Wilson, Atty. Gen., David R. Thomas, Asst. Atty. Gen., or Intervenor.

HUGHES, Justice.

This is an action for damages for personal injuries brought by appellee Reuben Grant against J. R. Hobbs and A. W. Wilson doing business as Hobbs and Wilson Transport Company.

█ Appellee was an employee of the Texas Highway Department and was injured when he was in the act of operating a lever on a moving oil truck owned and operated by appellants. Oil was transported by appellants to mixing or gravel pits where the oil was released by means of the lever for the purpose of preparing gravel and top soil for highway and road use. This mixing was done by employees of the Highway Department the details of which and the operations of the truck and oil lever will be described later.

Trial to a jury resulted in a verdict for appellee. Judgment based on this verdict was rendered with the exception that the State Highway Department, which had intervened, was, in accordance with a stipulation, awarded a portion of the judgment as reimbursement for payments made by it to appellee as Workmen's Compensation Benefits.

Appellants have thirteen points of error the first four of which are grouped for briefing and we will so discuss them.

These points are to the effect that the Court erred in overruling appellants' motion for instructed verdict and motion for judgment non obstante veredicto because (1) the undisputed evidence shows as a matter of law that there were dangers incident to operating the lever on the moving truck which dangers were open and obvious for which reason appellants owed no duty to appellee with respect to such dangers and (2) under the undisputed evidence as a matter of law appellee voluntarily encountered the hazards and dangers incident to operating the lever on the truck while the truck was in motion under the circumstances then existing.

The gravel pit (so-called) was oval in shape and about 200 yards long and 60 yards wide. Trucks carrying oil drove around the pit releasing the oil upon the top soil and gravel. A pulverizer, called a Seaman, was then used to mix the oil and gravel and this was followed by another treatment of oil and so on until the desired mixture was obtained.

The oil was transported by appellants under contract with the State Highway Department and it was unloaded and the mixing process was conducted by employees of the Highway Department.

The trucks used to transport the oil consisted of a truck and trailer, the oil being carried in the trailer. The lever which controlled the opening and closing of the valve so as to release and stop the flow of oil was located behind the drive wheels on the truck proper and in front of the dual wheels on the oil trailer. This lever could only be operated manually from a position between the truck and the trailer. It could be operated in no other way.

Mr. Burton Brown, an employee of the Highway Department and self styled "gang leader," supervised the crew of which appellee was a member in the operation above mentioned. He described the unloading of the oil as follows:

"Q. Tell the jury just what procedure you take to unload that truck? A. These trucks, these particular trucks had a valve on the back that you would open and close. And these trucks have a rod that came from

the back of the truck up beside the tank, and a lever sticking out about that far, you pull it to open it or push on it to close it.

"Q. Now, what about when you are going along unloading the truck, when you come to a place where you want to shut the valve off, what do you do? A. Holler at the truck driver to stop or wave at him or whistle or anything.

"Q. I will ask you to state what, if anything, is he supposed to be doing? A. Who is that, the truck driver?

"Q. Yes. A. He is supposed to be watching you.

"Q. What, if anything, is he supposed to do when he hears you or sees you make a flag for him to stop? A. He is supposed to stop.

"Q. All right. What, if anything, is he supposed to do? A. He is supposed to stop.

\* \* \* \* \* \*

"Q. Now, who controls the lever in the operation of that truck? When the truck should stop and start and so forth? A. The men that were unloading the trucks.

"Q. Would that be Reuben Grant on that date? A. He did.

"Q. How were those trucks with reference to—how were they equipped with reference to the assistance of the driver to see behind him and see what was going on? What did they have on them, if anything? A. They had a mirror on the side of the cab.

"Q. What kind of mirrors did they have, do you remember? A. I don't know what kind you would call them. They are eighteen inches long or fifteen or sixteen.

"Q. And about how wide, or do you know? A. I would say they were five or six inches wide.

"Q. What purpose did those reflectors have? What purpose did they serve? A. Well, the truck driver could see behind him.

"Q. Mr. Brown, when a truck come in there unloaded, who had— under Hobbs & Wilson, if they brought a truck in there to be unloaded, who had control over that truck, with reference to where the oil should be put, when it should flow and so forth? A. The driver, he knew where we were going to put it, and say Reuben Grant, he told him when to go and when to stop.

"Q. State whether or not under that arrangement the driver of the truck pulled in there on the pit, whether or not he was under instructions to comply with instructions of the swamper, the man who tells him when to stop and when to start? A. He was supposed to—he wasn't supposed to pull up until they had orders to, and he wasn't supposed to stop until he had orders to stop.

"Q. Now, then Mr. Brown, may I ask you this, in making that circle there, around that pit, would there be some place on the pit that you wouldn't need oil, is that right? A. At this particular place it was.

"Q. What about the place where there is clay and no gravel? A. That's what happened at this particular spot.

"Q. And you were going along putting out oil and you come to a place where there is clay then, what would you do? A. Cut it off.

"Q. Cut the oil off. And then you would move on. A. Yes, sir.

"Q. And then when you would come to a spot where the gravel was dissolvable, what would you to, what would be done, what would a swamper do? A. Open the valve and let out the oil.

"Q. I ask you this, to state whether or not the swamper and the driver of the truck worked together? It was a coordinated proposition, they worked together? A. They should have, yes, sir.

"Q. And whether or not the driver of the truck was duty bound, whenever the swamper flagged him or called for him to stop, he was duty bound to stop? A. Yes, sir."

Vernon Tilley was the driver of appellants' truck which injured appellee April 16, 1956. He and appellee had worked together in similar operations without difficulty and he, Tilley, knew that he was to start and stop his truck on instructions from Highway employees.

Appellee called in Tilley's truck which had been waiting its turn to unload. One complete round of the pit was made by Tilley's truck and a second round started when the truck approached a clay area that would not mix with the oil. This required the oil to be shut off to prevent wastage. Appellee, in the unloading operation, was accustomed to walk beside the truck which traveled slowly at a speed of one to three miles an hour. He walked on the driver's side and about six feet from the truck. He explained his injury as follows:

"Q. All right. Go ahead and tell us just what, if anything happened on that occasion? A. Well, when we come upon that clay place, where there wasn't any gravel, I was walking along to one side and I signalled and hollered for him to stop.

"Q. What did you say? A. Hold, and held my hand up.

"Q. Held what hand up? A. My right hand.

"Q. And go ahead. A. I walked up to the truck, thinking that he was going to stop, as he ordinarily did. I took a hold of the lever and the truck caught my foot, he didn't stop, it caught

my foot and jerked me down and run over my leg. Then he put it in reverse and backed off of it and after that, why I don't know what happened.

"Q. What wheel struck you? A. It was the front trailer duals on the left hand side.

"Q. Where did those wheels strike you? A. Well, they first caught my foot and rolled up my leg to my body.

"Q. Which foot? A. My right one and then backed off.

"Q. What was the last thing you remember? A. When it knocked me down, after he backed off of me, why, I don't remember for a while."

Mr. Tilley, driver of appellants' truck which struck appellee, testified as follows:

"Q. All right, sir, you were unloading oil at the stock pit. Will you continue and tell just how that is done? A. I was unloading oil at the stock pit, and you take—they start you off, show you where to stop, where to start.

"Q. Who is 'they'? A. The State men.

"Q. All right. A. They show you where to start and stop, how they want it shot.

"Q. What do you mean by shot? A. Unloading.

"Q. All right, sir. Go ahead. A. How they want it shot, and all you do is drive your truck. They furnish the swamper.

"Q. What is a swamper? A. That is the man that helps you on your truck.

"Q. What does he do? A. He opens and closes your valve.

"Q. All right, sir, go ahead. A. If you get stuck, he gets you a maintainer over there to get you out; and

that's about all the describing I can tell you, unless we go in to—

"Q. O.K. Now, not referring to the specific time this accident happened, but to the general operation, tell me just exactly what you would do as a driver and what the State man would do as a swamper. A. We would have laps that we would make.

"Q. You mean trips around the pit? Yes, sir. They are from 150 to 200, 300 yards long. You drive from one end to the other and stop, and when you stop, the swamper closes your valve. If you stop in between your laps, the oil puddles up, and then the State Foreman, he will get mad. I was driving southwest at this pit, approximately a mile or a mile and a half an hour—as slow as it would run in first gear. I was coming up to the end. I lacked 20 or 30 feet being to the end. I was watching in my rear view mirror for my swamper. When I passed him, he was up about half way the pit talking to the foreman. I guess that was Burton Brown. I kept moseying along, easing along, letting the oil out. I had on about a half a load. When I looked in the mirror, I was still looking, I saw the swamper coming. He was walking on down towards my truck. I kept watching him. He was walking along beside my trailer, he had got up beside my trailer, about 20 or 30 feet from the end—to the end where we stopped to close the valve. I glanced up to see how much further I had to go before I stopped, and when I looked back in the mirror, the swamper was laying under my trailer wheel. The duals had straddled his leg. If I had not stopped when I did, I would have run over him and maybe killed him. I stopped the truck as quick as I could, did not slide no wheels, put the truck in reverse and backed off of him, and got out and yelled for the rest of the men to come over where I was at."

On cross examination appellee testified:

"Q. Now then, on the—prior to the date of this accident, you had been doing this kind of work for some time, had you not? A. I had.

"Q. You knew where the position of these levers were, didn't you? A. I did.

"Q. You knew that they were three to four feet there in front of the front duals on the truck. A. I did.

"Q. And you knew that in order to pull or push that lever, you had to step in front of those duals, didn't you? A. I did.

"Q. You knew enough to know that when a truck is moving, there would be some danger incident to stepping in front of the wheels, didn't you? A. I sure did.

"Q. On this occasion you thought the truck was going to stop, didn't you? A. I signaled and hollered to him to stop.

"Q. All right. Then it was thinking in your mind that he was going to stop? A. That's right.

"Q. Now, if he hadn't stopped, you wouldn't have walked up there in front of those wheels, would you? A. I thought the man was going to stop.

"Q. Yes. But he didn't stop, did he? A. That was his fault.

"Q. Well, he didn't stop, no matter whose fault it was, did he? A. He didn't.

"Q. He did not. Yet then, with that truck still moving, you stepped up in front of those dual wheels to pull that lever, didn't you? A. Thinking he was going to stop as usual.

"Q. But he hadn't stopped when you stepped up there, had he? A. No, sir, he was rolling.

"Q. You knew there was some danger if he was rolling, in getting hit by the truck, didn't you? A. But ordinarily he stopped.

"Q. But you knew there was some danger in stepping up there if the truck was rolling, didn't you? A. Yes, sir.

"Q. And you fully appreciated that, didn't you? A. What do you mean there?

"Q. Well, you knew it was dangerous, some danger in stepping in front of moving truck wheels. A. Oh, yes.

"Q. Yet, you went ahead and stepped in front of the truck, didn't you? A. I was thinking it was going to stop.

"Q. All right. You were thinking it was going to stop but he didn't stop, did he? A. He didn't."

The jury found that Mr. Tilley, driver of appellants' truck failed to keep a proper lookout and that this was negligence proximately causing appellee's injuries.

The jury also found that appellee, immediately before being struck by the truck, signalled Tilley to stop the truck but that this signal was not heeded and such failure was negligence proximately causing appellee's injuries.

Appellants cite the opinion in Robert E. McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 396, as being decisive of this appeal and requires a judgment in their behalf. We do not agree.

In that case the Court applied the doctrine of volenti non fit injuria—voluntary exposure to risk—to a situation where an employee knowing the floor to be slick and appreciating the danger involved voluntarily climbed a ladder, placed on the floor, which slipped causing the employee to fall and suffer injury.

The situation there is not comparable to the one presented here. There the sole responsibility of the defendant was to furnish plaintiff a reasonably safe floor on which to work. The Court stated "It follows from what has been said that in working on the slick floor the plaintiff voluntarily exposed himself to the dangers thereof which he fully realized and the defendant breached no duty it owed him."

Here there was a duty which appellants owed appellee, a duty it undertook and which it failed to perform—the duty of keeping a proper lookout and stopping the truck on appellee's signal.

Of course it would have been dangerous to the point of foolhardiness for appellee to step between the wheels of a trailer and the wheels of the truck to operate the lever while the truck and trailer were in motion and we would so hold if the other factors present here were absent. These were that appellee relied upon the duty of the truck driver to stop upon his signal which he gave, and which the truck driver did not observe because he failed to keep a proper lookout. This act of negligence on the part of appellants was not within the scope of the dangers to which appellee voluntarily exposed himself. The rule is stated in 65 C.J.S. Negligence § 174, p. 852, as follows:

"The doctrine of assumed risk is inapplicable where the danger and peril of the situation were not the proximate cause of the injuries, as where defendant was guilty of willful and wanton misconduct, or where, apart from the assumed risk, defendant or a third person was negligent, and such negligence was the proximate cause of the injury suffered, unless plaintiff participated in such negligent acts or knew or had reason to believe that they were being committed or were about to be committed."

In Wood v. Kane, 150 Tex. 191, 238 S.W. 2d 172, 174, in speaking of the doctrine of voluntary exposure to risk the Court said: "It means that the injured party consented

to the act or omissions which caused his injury and which, without such consent, would be a legal wrong."

There is no suggestion here that appellee consented to the failure of the truck driver to keep a proper lookout or to stop the truck on signal.

The parties have cited many authorities and to discuss them all would consume time and space not warranted by the value of such discussion. The principles to be applied are not uncertain. Their application is, as usual, attendant with difficulty. We believe we have correctly applied them here and so believing we overrule points 1–4.

■ Point 5 is that the Court erred in refusing to submit to the jury these (abbreviated) requested issues (1) Did appellee attempt to operate the lever while the truck was in motion? (2) If so was this dangerous? (3) If so did appellee know or by the exercise of ordinary care should he have known of such dangers? (4) If so did appellee know and appreciate such dangers? (5) If so was appellee's conduct the result of a free choice by him?

By these requested issues appellants sought to submit the elements of the doctrine of voluntary exposure to risk.

It is our opinion that the Court did not err in refusing to submit these issues.

They could all have been submitted and they could all have been answered favorably to appellants and the result here would be the same. This for the reason that they do not fit the case.

We have held that the doctrine of voluntary exposure to risk was inapplicable to the negligence pleaded and proved by appellee. If we are correct in such holding then each element of such doctrine is inapplicable and they would not constitute controlling issues which the Trial Court was required to submit to the jury.

■ Points 6 and 7 are briefed together. They relate to jury argument made by appellee's attorney. We quote the substance of the argument claimed to be improper:

"I have no apologies to make for my client, Mr. Reuben Grant, I'm proud indeed that I can look upon him with commendation and present him to you as a very fine citizen of your county. Notwithstanding this Dallas lawyer may criticize him * * *."

The objection to this argument was:

"Now, Your Honor, I object to his referring to the locality from which I came from."

Motion for mistrial was also made. Both the objection and motion were overruled.

Prior to the argument complained of the attorney for appellants had told the jury "We take chances that we ought not to take. I drive my car going back to Dallas. I'll probably go over sixty miles an hour. * * *"

We find no error in this argument. It may have been immaterial but it was in no sense prejudicial. Appellants' attorney had previously intimated to the jury that he was from Dallas. Evidently he was not ashamed of this.

In the absence of evidence we will not assume by way of common or judicial knowledge that there is any stigma, actual or implied, in the reference to appellants' counsel as a "Dallas lawyer."

■ The eighth point complains of the refusal of the Trial Court to permit appellants to withdraw their announcement of ready when they learned during the course of the trial that appellee had changed his testimony from that given in a deposition prior to the trial.

Appellants introduced in evidence the following portion of appellee's deposition:

"Q. Did he (the foreman) ever give you any instructions not to touch a lever before a truck was stopped, anything like that? A. Yes.

"Q. He did? On how many occasions? A number or times, once? A. Oh, no, when he told me how to open those trucks when we started.

"Q. Told you they were stopped first? A. He told me to always holler at those men, to signal when the start and stop.

"Q. Tell them when to start? A. He told me to signal.

"Q. You are not answering my question. Did he tell you to open and close the valves when the trucks were stopped? A. He told me when we started to signal it, then when I wanted them to stop.

"Q. Did he give you any instructions about opening and closing the valves when the trucks were stopped other than that? A. He told me to signal them when the trucks was stopped was all."

On the trial appellee testified in reference to the above testimony:

"A. I said they instructed me not to take a hold of that valve when the truck was moving, but they did not do that."

When appellants moved to withdraw their announcement in view of the foregoing it was ascertained by the Court and appellee's counsel that appellee was employed by the State of Texas and that both his superior foreman and his (the foreman's) "immediate" superior, Mr. Brown and Mr. Dike, were present.

In support of their motions counsel for appellants made the following statement to the Trial Judge:

"We talked with Mr. Brown this morning and he says he does not remember that those instructions were given. We had relied on him testifying that way but, he apparently is not. Mr. Dike says he knows nothing about instructions. We have not brought here, any witnesses, because of the fact that this man had testified in his deposition that these instructions were given. We had a statement from Mr. Brown that these instructions were given. We have not brought here our driver, whose deposition we have here, who could testify to these instructions. We further have not brought here any fellow employees of Mr. Tilleys, who could also testify to these things. We relied on what was in this deposition. We think it is a monumental element of our case."

We also quote the following colloquy between the Court and counsel for appellants:

"By The Court: Overrule the motion to withdraw, if both of the foremen have been instructed to be back here. They are the only two people that could possibly know what instructions were given. I'm assuming there wasn't somebody with him at all times, when they might have given instructions.

"By Mr. Patterson: They would say, if we had our drivers here, they would testify they were present at conversations when instructions were given.

"By The Court: You had better get them here, because I've continued this case one time to get them up here."

We perceive no error in these proceedings.

It was appellee's duty as well as his privilege to correct or explain a previous misstatement. If this produced surprise then appellants' prerogative was to ask leave to withdraw their announcement and file an application for a continuance in accordance with Rules 251–252, Texas Rules of Civil Procedure. See Williams v. Humble Oil & Refining Co., Tex.Civ.App.El Paso, 139 S.W.2d 346, writ dism., cor. judm. This they did not do. McDonald Texas Civil Practice, Sec. 11.18, in discussing a withdrawal of an announcement of ready states:

"Not lightly to be disregarded are the expense and the time consumed in the selection of the jury and the receipt of such evidence as may have been offered before the party seeks to withdraw, and the delay to the opponent which will result from a continuance. Accordingly, one who desires to withdraw his announcement of ready and secure a postponement must seek leave to do so by an application to the court, the decision being left to the discretion of the trial judge. In the absence of a proper application, there can be no basis for complaint that the court has abused his discretion in compelling the parties to proceed with the trial."

We believe, under the circumstances here, that it was incumbent upon appellants to support their motion by affidavit as required by Rule 251.

The ninth point asserts error in the repeated effort of counsel for appellee to obtain inadmissible and prejudicial testimony from appellee.

▉ The record shows that on several occasions appellee's own counsel attempted to have him testify that the driver of the truck which struck him "was in a hurry."

Appellants' principal objection to this proffered testimony was that it constituted an opinion or conclusion of the witness.

Appellants do not brief the admissibility of the testimony but content themselves with citing authorities that it is error for an attorney to repeatedly ask questions where the Judge has ruled the evidence inadmissible.

We will not determine the admissibility of the testimony sought from the witness although under the rule stated in Vol. II (2d ed.) Sec. 1429 (P. 275) of Texas Law of Evidence, McCormick and Ray, the testimony was clearly admissible as a shorthand rendition of the facts.

We quote the record on the question presented:

"Q. Did you have any reason in the world to believe he wouldn't stop? A. I think he was just in a hurry—

"Mr. Patterson:

"Well, now, please the Court, that's an opinion and conclusion. It's highly *inflamatory*.

"By The Court:

"Well it's repetition also. Sustain the objection.

\*　　\*　　\*　　\*　　\*　　\*

"Q. May I ask you this question, did you have occasion to observe the movements and activities of Vernon G. Tilley there, while he was driving that truck, as compared with the other boys?

"Mr. Patterson:

"Now, if it please the Court, that's immaterial and irrelevant. No pleading on which to sustain such—

"By The Court:

"Overrule the objection. Just answer yes or no.

"A. I did.

\*　　\*　　\*　　\*　　\*　　\*

"Q. What was that?

"Mr. Patterson: We object to that question.

"By The Court: Sustain the objection.

"Mr. Faver:

"Q. What difference, if any, did you notice in the manner in which Vernon G. Tilley was operating his truck, in carrying his truck around there, as other boys, as to the way those other three trucks those boys had been operating their trucks?

"By Mr. Patterson: If it please the Court, that's immaterial. There is no pleading on which to sustain any action other than those specifically plead.

"By The Court: Overrule the objection. You may have your exceptions.

\* \* \* \* \* \*

"Mr. Faver:

"Q. The Court has said you can answer that question. A. Well, Vernon Tilley would always come in and he would maybe park his truck—

"Q. I'm talking about on that occasion, that day. A. He just didn't stop when I hollered at him. He was in a hurry, he wanted to get out.

"Mr. Patterson: We object, if the Court please.

"By The Court: Sustain the objection to the answer. Ladies and gentlemen of the jury, you will not consider that answer for any purpose in this case.

\* \* \* \* \* \*

"Mr. Faver:

"Q. May I ask you this, to state whether or not he drove in the same speed and in the same manner that the other trucks did; if there is any difference, I want you to tell us about it. A. Well, he was just always in a hurry—

"Mr. Patterson: If it please the Court, that's not responsive. That's an opinion and conclusion.

"By The Court: Sustain the objection.

\* \* \* \* \* \*

"Mr. Faver:

"Q. Please state whether or not, in the movements of that truck of Vernon G. Tilley's, on that date in question, just before this happened, whether or not he drove that truck in the same deliberate manner and in the same way in which the other truck drivers, who had made the same run that same day, just before this happened? A. He was in a hurry to get out.

"Mr. Patterson: We object.

"By The Court: Sustain the objection.

"Mr. Patterson: If it please the Court, we would certainly like for the witness to be instructed not to make that answer. It's highly *inflamatory* and prejudicial; it's clearly not admissible.

"By The Court: Sustain the objection."

No motion for mistrial was made by appellants as some authorities seem to require. See Rollin v. Condra Funeral Home, Tex.Civ.App. Austin, 309 S.W.2d 940, writ granted.

We do not believe that the proceedings above are sufficient to show that counsel for appellee deliberately disobeyed the rulings of the Court. It seems to us that the witness was not always responsive to the question and that it was the answers and not the questions which were objectionable to appellants. In any event it appears that after the Court was requested to instruct the witness not to make the objectionable answer any more it was not made.

Trials would be fragile indeed if they are to be overturned on the basis of the showing made under this point.

■ Points 10 and 11 are that the Trial Court erred in submitting the following issue to the jury over objections that (1) It assumes a controverted fact and is a comment on the evidence and (2) It is a general charge and advises the jury of the effect of their answers to other issues submitted to it:

"What sum of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would fairly and reasonably compensate the plaintiff, Reuben Grant, for such damages, if any, as he has sustained, or will in reasonable probability sustain in the future, arising out

of the negligence of defendants, if any, and as a direct and proximate result from the personal injuries, if any you have found, sustained by him by reason of his having been struck by defendants' truck on or about April 16, 1956?

"Answer by stating the amount, if any, you find, in dollars and cents."

Under (1) above it is appellants' contention that by use of the phrase "sustained by him by reason of his having been struck by defendant's truck on or about April 16, 1956", the Court assumes that the injuries were sustained in the manner claimed by appellee whereas appellants' theory of the incident was that appellee was injured because he slipped and fell in front of the wheels of the moving truck.

We do not believe the issue subject to the interpretation which appellants give it. It is undisputed that the wheels of the trailer which appellants' truck was pulling rolled onto appellee's right foot and up his leg to his body and that he sustained injuries.

Appellants do not suggest any word which the Court could have used instead of "struck" and we can think of none more appropriate. "To strike" means "to touch or hit with some force—to come into collision with." See Webster's New International Dictionary (2d ed. Unabridged).

The phrase objected to does not indicate what caused appellee's body to touch or to be hit by or to come in collision with appellants' trailer wheels or in what manner this occurred, and in our opinion, is not subject to the criticism made by appellants.

■ Adverting to (2) above appellants say that the jury is told by the issue "that they must find defendants negligent and that their negligence is a proximate cause of Grant's injuries" in order for him to recover. In support of this statement they cite Humble Oil & Refining Company v.

McLean, Tex.Com.App., 280 S.W. 557, 559. We have examined this case and find that it was decided before adoption of the present Rules of Civil Procedure and under statutes which, as the Court said, "does not contemplate" that a case could be tried under a combination of special issues and a general charge. This is not now correct. Rule 277, T.R.C.P.; Johnson v. Zurich General Accident & Liability Ins. Co., 146 Tex. 232, 205 S.W.2d 353; Mosby v. Texas & P. Ry. Co., Tex.Civ.App. El Paso, 191 S.W.2d 55.

In Humble Oil & Refining Co. v. McLean the Court stated that "The general charge, which was submitted to the jury in this case, as a preface to the special issues submitted, is of such length that expediency forbids that it be set out in full here." From what the Court said about the charge there we can find no similarity to the issue complained of here and further discussion of that case seems futile.

It is quite true that from the wording of this special issue an intelligent juror could gather that appellee was not entitled to damages unless appellants were guilty of negligence which was a proximate cause of his injuries. We believe that any intelligent juror would know this regardless of whether he was so informed by the Court. The rights of appellants were not prejudiced by telling the jury what it already knew. Finck Cigar Co. v. Campbell Co., 134 Tex. 250, 133 S.W.2d 759.

Point 12 is that the judgment is excessive.

The amount awarded appellee was $61,200.

■ Appellee was 47 years of age when injured and had a life expectancy of 23 years. He was married and his wife and four minor children were dependent upon him. He left school after completing the fourth grade and has had no other formal education. He has had no specialized training. Farming and working as a day

laborer has been his life's work. He earned $3,095.37 during his last full year as a Highway Department employee for which he had worked since 1951. This amount about equalled his earnings during the previous years of such employment. He earned from $800 to $1,200 a year additionally from farming. His work was regular.

Prior to being injured he was a strong able-bodied man and had never suffered serious illness or injury.

Appellee suffered intense pain as a result of his injury and received opiates to lessen it. X-rays revealed fractures of the right metatarsal bone and the first conical bone. He suffered multiple injuries to the skin, muscles, ligaments, nerves and tendons of the right leg. His entire right leg was placed in a cast. He was under medical treatment for more than a year and continues to take self treatment prescribed by his doctor.

Appellee was confined to bed for some weeks after which he was able to walk by use of two crutches for seven or eight months. He walked with one crutch at the time of trial. Appellee has been totally unable to do any work since the date of his injury. He is unable to bend or to lift and has lost control of his knee to such an extent that he has to hold his leg in position. His right leg is smaller than his left and will not support his weight. He has never ceased to suffer considerable pain in his entire foot and leg and into his hip and back. His physical condition has remained such that he has had to continue taking medication; he is nervous, suffers from anguish, worry and apprehension all the time, and is repeatedly unable to sleep. There was no perceptible improvement in his condition for a ninety day period just prior to the trial.

In describing appellee's condition at the time of the trial, his physician testified that his right leg and thigh were smaller than his left, the result of crushing the muscles in the medial part, the inner side, of the thigh, causing a destruction of fibres with the replacement of scar tissue. A by-product of the nerve injury is a condition known as causalgia, produced by the scar tissue formed about the crushed nerve. The result is that any person so injured, as appellee has been, may for years afterwards be disabled by recurrent shooting pains.

At the time of his last examination, shortly prior to the trial, the doctor estimated at 50% the disability of appellee's foot, leg and thigh. His most hopeful prognosis was that "probably by careful and prolonged training in the future, * * the disability might in time be reduced to 25%." At least 25% disability in the use of the leg is expected to be permanent.

The doctor further testified that the appellee's present condition would make it impossible for him to do manual labor and that in his opinion he would never be able to perform heavy or industrial work. Appellee has been examined by other doctors, but they too have been unable to effect any substantial relief.

We are unable to say from this record that the jury did not fairly, honestly and impartially weigh the evidence and return a verdict uninfluenced by prejudice or any improper motive. The damages assessed by the jury are within the bounds of reason under the evidence and we cannot say that it is excessive. Texas & New Orleans Railroad Co. v. Hayes, Tex.Civ. App. Austin, 284 S.W.2d 776, affirmed Tex., 293 S.W.2d 484.

Appellant's last point is that even if no single error requires reversal that the cumulative effect of several errors should bring this about. The "errors" referred to are those asserted in points 6, 7, 8 and 9. Since we have held those points not to present error this point is overruled.

The judgment of the Trial Court is affirmed.

Affirmed.